IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

KATHLEEN M. NOLAN,                )
                                  )
          Plaintiff,              )
                                  )
     vs.                          )    Civil Action No. 10-1639
                                  )
MICHAEL J. ASTRUE,                )
COMMISSIONER OF SOCIAL            )
SECURITY,                         )
                                  )
          Defendant.              )

## MEMORANDUM OPINION

## I. INTRODUCTION

Plaintiff, Kathleen M. Nolan, seeks judicial review of a
decision of Defendant, Michael J. Astrue, Commissioner of Social
Security ("the Commissioner"), denying her applications for
disability insurance benefits ("DIB") and supplemental security
income ("SSI") under Titles II and XVI, respectively, of the
Social Security Act, 42 U.S.C. §§ 401-433 and §§ 1381-1383f.[1]
Presently before the Court are the parties' cross-motions for
summary judgment pursuant to Fed.R.Civ.P. 56. For the reasons
set forth below, Plaintiff's motion for summary judgment will be

---

[1] The Social Security system provides two types of benefits based on an
inability to engage in substantial gainful activity: the first type, DIB,
provides benefits to disabled individuals who have paid into the Social
Security system through past employment, and the second type, SSI, provides
benefits to disabled individuals who meet low-income requirements regardless
of whether the individuals have ever worked or paid into the Social Security
system. With respect to Plaintiff's claim for DIB, her earnings record shows
that she has acquired sufficient quarters of coverage to remain insured
through September 30, 2011. (R. 13).

1

granted, and the Commissioner's cross-motion for summary judgment will be denied.

## II. PROCEDURAL HISTORY

Plaintiff protectively filed applications for DIB and SSI on October 5, 2007, alleging disability since April 15, 2006 due to fusion of her C6-7 vertebrae, paralysis, headaches, tremors, back pain, impaired vision and failing memory. (R. 98-113, 120). Plaintiff's applications were denied and she requested a hearing before an administrative law judge ("ALJ"). (R. 57-66, 68). Plaintiff, who was represented by counsel, testified at the hearing which was held on November 3, 2008. A vocational expert ("VE") also testified. (R. 21-53).

The ALJ issued a decision on March 17, 2009, denying Plaintiff's applications for DIB and SSI based on his determination that Plaintiff retained the residual functional capacity ("RFC") to perform work existing in significant numbers in the national economy.[2] (R. 11-20). Plaintiff's request for review of the ALJ's decision was denied by the Appeals Council on November 2, 2010. (R. 1-3, 6-7). Thus, the ALJ's decision became the final decision of the Commissioner. This appeal followed.

---

[2] The Social Security Regulations define RFC as the most a disability claimant can still do despite his or her physical or mental limitations. 20 C.F.R. §§ 404.1545(a), 416.945(a).

## III. BACKGROUND

Plaintiff was born on August 7, 1966. (R. 116). With respect to education, Plaintiff completed two years of college in nursing. (R. 43). At the time of the hearing before the ALJ in November 2008, Plaintiff resided with her fiance and his mother on the first floor of a two-story home. (R. 31). Plaintiff has a driver's license; however, she has not driven a car since 2007.[3] (R. 30). In the past, Plaintiff has worked as a health unit coordinator in a hospital, a customer service representative for an airport motel and in a fast food establishment. (R. 45-46).

With respect to her medical conditions, Plaintiff testified during the ALJ hearing that she underwent surgery for neck pain on August 1, 2006; that the surgery provided relief from the pain for approximately 5 to 6 months before her knees "started giving out," her hands "started not to grasp," she developed neuropathy and severe headaches, and she could not turn her neck; that she suffers from headaches several days a week which are accompanied by vertigo, blackouts, blurred vision and confusion; that she takes medication and lies down 6 to 8 hours when she gets a headache; that she suffers from pain in her eyes, face, neck, left arm, legs and feet; that she had an

---

[3] During the hearing before the ALJ, Plaintiff testified that she was not allowed to drive at that time, presumably due to her medical conditions. (R. 30).

3

upcoming appointment with a neurosurgeon due to the results of
an MRI of her low back; that she had been in a wheelchair for 6
months; that she used a cane to ambulate; that she had been
diagnosed with cancer in early 2008; that she underwent two
rounds of chemotherapy before the treatment had to be
discontinued; that aggressive radiation therapy had been
suggested as an alternative to chemotherapy;[4] and that she
receives assistance with activities of daily living ("ADLs"),
i.e., bathing, preparing meals and cleaning, three days a week
for six hours a day from an organization called Community Care
Connections. (R. 31-33, 35-38).

At the time of the ALJ hearing, Plaintiff was taking the
following medications and vitamin: Tylenol, Aspirin, Fioricet,
Valium, Neurontin, Morphine, Vitamin D, Macrodantin, Percocet,
Protonix, Pyridium, Zocor, Restoril, Coumadin and Compazine. In
addition, she was using Advair and Spiriva inhalers.[5] (R. 24-26,
150).

---

[4] During the ALJ hearing, Plaintiff testified that she had changed oncologists
the previous week and that her new oncologist, Dr. Rothman, suggested
radiation therapy to treat Plaintiff's breast cancer. (R. 39).
[5] Tylenol is used to relieve mild to moderate pain from, among other things,
headaches, muscle aches and backaches. Aspirin is used to relieve the
symptoms of rheumatoid arthritis, osteoarthritis, systemic lupus
erythematosus and certain other rheumatologic conditions. Fioricet is a
combination of drugs used to relieve tension headaches. Valium is used to
relieve anxiety, muscle spasms and seizures. Neurontin is used to help
control certain types of seizures in people who have epilepsy, to relieve the
pain of postherpetic neuralgia and to treat restless leg syndrome. Morphine,
which is in a class of medications called opiate (narcotic) analgesics, is
used to relieve moderate to severe pain. It works by changing the way the
brain and nervous system respond to pain. Vitamin D helps your body absorb
calcium, which your bones need to grow. Macrodantin is an antibiotic used to

4

With regard to the possibility of a psychological component to her pain, the following exchange took place between Plaintiff and the ALJ during the hearing:

\* \* \*

Q. Are you currently seeking or undergoing any psychological/psychiatric care?

A. No, sir. I was seen by a psychiatrist at Health South Harmorville [phonetic] (sic) that I was not even measured on the depression scale, and conversion order (sic) was not even part of my diagnosis.[6]

Q. Okay.

A. There's nothing wrong with me mentally. Along with my primary care physician agrees with that.

Q. Do you agree with that?

A. Yes, sir, I do.

\* \* \*

Q. I'm not sure I understood you. I think I did the first time, but then some answers you gave – are you asking

---

fight urinary tract infections. Percocet is used to relieve moderate to severe pain. Like Morphine, Percocet is a narcotic. Protonix is used to treat gastroesophageal reflux disease, a condition in which backward flow of acid from the stomach causes heartburn and possible injury of the esophagus. Pyridium relieves urinary tract pain, burning, irritation and discomfort, as well as urgent and frequent urination caused by urinary tract infections, surgery, injury or examination procedures. Zocor is used together with lifestyle changes (diet, weight loss and exercise) to reduce the amount of fatty substances in the blood. Restoril is used on a short-term basis to treat insomnia. Coumadin is used to prevent blood clots from forming or growing in your blood and blood vessels. Compazine is used to control severe nausea and vomiting. Advair and Spiriva inhalers are used to prevent wheezing, shortness of breath and breathing difficulties caused by asthma and COPD. www.nlm.nih.gov/medlineplus/druginfo ("MedlinePlus").

[6] Conversion disorder is a somatoform disorder. Disorders in this category include those where the symptoms suggest a medical condition but where no medical condition can be found by a physician. In other words, a person with a somatoform disorder might experience significant pain without a medical or biological cause, or they may constantly experience minor aches and pains without any reason for these pains to exist. http://allpsych.com/disorders.

some doctor whether or not you have depression or telling them you have - you're depressed, and they're telling you you're not?

A. I just asked him if any of this could be in my head, and he repeatedly said various times no, this is not in your head. This is a true medical, painful condition.

Q. But you've not had any consult or anything like that with a psychologist or psychiatrist?

A. I did at Health South Harmorville (sic), and he agreed that I am not psychologically depressed. It wasn't even measurable on the scale.

Q. Harmorville (sic)?

A. Yes, his name was Guy Bressigner [phonetic] (sic)?

\*   \*   \*

Q. Okay, I'm not being funny here, but do I get something from your answers that you are resistant to saying you have some mental issues? Or am I missing the point?

A. You may just be missing the point because I have absolutely no mental issues --

Q. Okay.

A. - to be blunt.

Q. And you're not claiming that today?

A. I'm claiming that I have absolutely no mental issues -

Q. Okay.

A. - today.

\*   \*   \*

(R. 32-33, 40, 42-43).

6

## IV. MEDICAL EVIDENCE

The medical evidence in Plaintiff's file at the time the ALJ issued his adverse decision may be summarized as follows:[7]

In April 2006, while residing in Wisconsin, Plaintiff sustained a neck injury as a result of lifting a 100-pound suitcase at work. In addition to pain, Plaintiff developed radicular symptoms down her left arm. After multiple modes of conservative treatment failed, Plaintiff opted for surgical intervention. The surgery, which took place on August 1, 2006 at Froedtert Memorial Lutheran Hospital in Milwaukee, Wisconsin, was performed by Dr. Raj Rao. The surgeon's pre- and post-operative diagnoses were the same: "Degenerative cervical spondylosis, C4-5, C5-6, C6-7, with superimposed disk protrusion, C6-7, causing left-sided cervical radiculopathy."[8]

---

[7] On September 22, 2010, approximately 70 pages of additional medical evidence was submitted to the Appeals Council in support of Plaintiff's request for review of the ALJ's decision, which, as noted previously, was denied. (R. 5). The evidence included: (1) reports of further diagnostic tests, (2) records of a hospitalization on December 30, 2008, (3) reports of consultative disability evaluations of Plaintiff performed on September 9, 2009 and July 9, 2010, 2008, (4) records of Advanced Pain Management relating to treatment provided to Plaintiff between March 30, 2010 and June 21, 2010, and (5) a questionnaire completed by Plaintiff's treating psychiatrist and therapist in July 2010 regarding Plaintiff's limitations from her medical conditions. (R. 1075-1149). Because the ALJ's decision was rendered without consideration of the foregoing evidence, however, the Court may not consider it in determining whether the decision was supported by substantial evidence. Jones v. Sullivan, 954 F.2d 125, 128 (3d Cir.1991), citing United States v. Carlo Bianchi & Co., 373 U.S. 709, 715 (1963) (Evidence that was not before the ALJ cannot be used to argue that the ALJ's decision was not supported by substantial evidence).

[8] The surgery included (1) an anterior cervical discectomy and foraminotomy with fusion and anterior instrumentation at C6-7, and (2) insertion of a structural interbody allograft at C6-7 with pack internal filling using demineralized bone matrix and DBX putty. (R. 165).

7

Plaintiff was deemed stable for discharge the day after her surgery. (R. 153-55, 162, 165).

During follow-up visits with Dr. Rao on August 10, September 18 and November 6, 2006, Plaintiff was noted to be doing "extremely well." She was ambulating without an assistive device and she was very comfortable without a neck brace. X-rays taken during those office visits showed good alignment of the graft and plate at the C6-7 level. (R. 175, 177-78, 189-90).

On May 7, 2007, Plaintiff underwent a physical therapy ("PT") evaluation at the Grove City Medical Center ("GCMC") for neck pain based on a referral by her primary care physician ("PCP") at the time, Dr. Ellen Mustovic.[9] The therapist's assessment was described as follows:

> ASSESSMENT/PROBLEM LIST: Patient demonstrates with impaired posture with forward shoulders and forward head as well as increased pain and decreased mobility of left shoulder and neck. Patient shows impaired ability to perform usual tasks of daily living and employment as sales director. Patient reports that she has to be able to lift objects in and out of vehicles to return to her previous level of employment. Patient shows fair rehab potential. Patient continues to report left upper and lower extremity neurologic/sensory symptoms.

(R. 735-38).

Plaintiff attended PT sessions on May 9, 11, 14, 16, 18 and 21, 2007. A note dated May 23, 2007 indicates that Plaintiff's PT

---

[9] GCMC is located in Grove City, Pennsylvania. Plaintiff moved to Pennsylvania from Wisconsin in November 2006. (R. 35).

8

was suspended per her doctor's orders. The PT discharge summary states that Plaintiff was discharged due to her failure to progress. Plaintiff continued to report severe pain (10/10), headaches and numbness, and she was not tolerating the PT modalities or gentle stretching. (R. 725-34).

Due to continued complaints of neck pain, Dr. Mustovic ordered tests for Plaintiff. The result of a CT scan of Plaintiff's cervical spine on May 31, 2007 was described as follows:

> CONCLUSION: Postoperative changes at the C6-7 level with satisfactory position of bone plug. No bony erosions are seen. Moderate bilateral neural foraminal narrowing at the C6-7 level seen left greater than right as described above.

(R. 222).[10]

On June 11, 2007, Plaintiff presented to the Emergency Department ("ER") of GCMC complaining of left-sided weakness and an increasing headache. A CT scan of Plaintiff's head showed no acute intracranial changes. An MRI of her cervical spine showed mild to moderate spinal stenosis at the C4-5 level and mild spinal stenosis at the C5-6 and C6-7 levels. (R. 248-50, 254-55).

On June 16, 2007, Plaintiff returned to the ER of GCMC continuing to complain of severe neck pain (greater than 10)

---

[10] An x-ray of Plaintiff's cervical spine the same day also showed neural foraminal narrowing at the C6-7 level, but no significant alignment issues. A cervical spine MRI was recommended if Plaintiff's pain persisted. (R. 221).

radiating down her left arm and leg with numbness and weakness. An MRI of Plaintiff's head showed no significant change since the MRI five days earlier.  Plaintiff was transferred by ambulance to UPMC Presbyterian Hospital for a surgical consult. (R. 240-43, 247).  On June 17, 2007, an x-ray of Plaintiff's cervical spine showed "[s]tatus post anterior cervical fusion of C6 and C7 with no evidence of hardware complications;" an MRI of Plaintiff's cervical spine showed "[m]oderate stenosis at C5 and C6, C6 and C7, in part due to congenital short canal and disc osteophyte complex" and "[n]o cord signal abnormality;" and an x-ray of Plaintiff's lumbar spine showed "[n]o evidence of an acute bony injury," "normal alignment" and "mild degenerative disease at L5-S1 level."  (R. 347-50).

Plaintiff returned to the ER of GCMC on July 5, 2007 with complaints of dizziness and numbness in her left arm and leg. Plaintiff was tearful and occasionally cried out in pain, stating that she was unable to walk.  A CT scan of Plaintiff's cervical spine showed no significant change since the CT scan performed on May 31, 2007.  Plaintiff was transferred to UPMC Presbyterian Hospital by ambulance for further evaluation and treatment.  (R. 256-60).

A CT scan of Plaintiff's head for bilateral face pain at UPMC Presbyterian Hospital on July 5, 2007 was normal.  An MRI of Plaintiff's total spine canal to evaluate for cord

abnormalities on July 6, 2007 showed (a) mild narrowing of the central canal at C5-6 and C6-7, otherwise the cervical spine was normal, (b) an unremarkable thoracic spine, and (c) minimal degenerative changes at L5-S1 and L4-L5 without significant compromise of the central canal or neural foramina.  (R. 352-56).

On July 30, 2007, Plaintiff was evaluated by Dr. Joseph Nour, a pain specialist, for her complaints of (1) neck pain radiating down her left arm, (2) constant burning, numbness, weakness and coldness in her left fingers, (3) frequent headaches, and (4) sharp, shooting pains and spasms in her lower back radiating down her left leg with constant numbness in her left toes.  Plaintiff stated that standing, walking, coughing and sneezing increased her pain which she rated between 9 and 10 on a scale of 1 to 10.  Plaintiff's physical examination revealed extreme limitation in the range of motion of her neck, as well as diffuse tenderness.  Dr. Nour indicated that Plaintiff's symptoms were consistent with cervical radiculopathy.  After discussing treatment options, it was decided that Plaintiff would proceed with cervical paravertebral nerve blocks, as well as occipital nerve blocks for occipital neuralgia.  Plaintiff tolerated the procedures well.  (R. 195-99).

Plaintiff underwent a second set of cervical paravertebral and occipital nerve blocks by Dr. Nour on August 6, 2007. During this office visit, Plaintiff, who was tearful and complaining of a headache, reported a slight improvement in her pain level (8/10). Although her headaches continued to be severe, Plaintiff reported that they occurred less frequently. (R. 200-02).

In a Health Sustaining Medication Assessment Form completed for the Pennsylvania Department of Public Welfare on August 10, 2007, Dr. Mustovic rendered the opinion that Plaintiff was temporarily disabled (April 15, 2006 to April 15, 2008) due to "Neck pain s/p Spinal Fusion." At the time, Plaintiff was taking Neurontin, Skelaxin, Cymbalta, Morphine Sulfate and Lunesta.[11] (R. 206-08).

On August 13, 2007, Plaintiff returned to Dr. Nour for a third set of cervical paravertebral and occipital nerve blocks. During this office visit, Plaintiff reported continuing headaches, although they were slightly less severe, and a 25% improvement in her pain level. (R. 203-05).

On August 20, 2007, Plaintiff presented to the ER of Allegheny General Hospital complaining of neck pain and arm

---

[11] Skelaxin, a muscle relaxant, is used with rest, physical therapy and other measures to relax muscles and relieve pain and discomfort caused by strains, sprains and other muscle injuries. Cymbalta is used to treat depression and generalized anxiety disorder. It is also used to treat ongoing bone or muscle pain such as lower back pain and osteoarthritis. Lunesta is used to treat insomnia. MedlinePlus.

12

weakness. Plaintiff stated that the neck pain had become "unbearable" over the course of the previous four days. An MRI of Plaintiff's cervical spine showed stenosis at C5-6 and C6-7, but neurosurgical intervention was ruled out. Anti-inflammatory medication was prescribed for Plaintiff, and she was instructed to follow-up with her PCP. (R. 214-20).

During an admission at Butler Memorial Hospital, an MRI of Plaintiff's cervical spine on August 23, 2007 for complaints of neck pain, left arm pain and an inability to move her legs since that morning showed a mild diffuse annular bulge at the C5-6 level. There was no evidence of spinal stenosis or disc herniation, and the cervical cord showed normal signal. (R. 546). An MRI of Plaintiff's lumbar spine on August 24, 2007 for complaints of left leg pain showed a small focal central disc protrusion at the L5-S1 level. (R. 544). The impression of an MRI of Plaintiff's brain the same day for complaints of left arm weakness was described as follows:

IMPRESSION
1. Moderate scattered T2 and FLAIR hyperintensities in the white matter, mostly in a peripheral distribution in the fronto-parietal lobes which are nonspecific for atypical demyelinating disease versus unusual early microvascular ischemic changes in this relatively young female patient.
2. No evidence of acute or recent infarct on diffusion imaging.
3. No mass effect, edema, or enhancing brain lesions.
4. Close clinical/neurologic correlation is necessary.

(R. 542).

Finally, a CT scan of Plaintiff's head at Butler Memorial
Hospital on August 26, 2007 for headache complaints showed "[n]o
acute bleed or mass effect." (R. 541).

On August 28, 2007, Plaintiff presented to the ER of GCMC
in tears, complaining of burning and pressure in her head and
face, episodes of blacking out, an inability to use her left arm
and leg and unresponsive eyes.[12]  Plaintiff was transferred to
Cleveland Clinic for further evaluation and treatment. (R. 223-
24).

Plaintiff underwent various tests upon her admission to
Cleveland Clinic. (R. 333-43). On August 30, 2007, Dr. Esteban
Cheng Ching performed a neurological evaluation of Plaintiff.
Plaintiff reported (a) constant burning and shooting pain over
the left side of her face, arm, thorax, abdomen and leg with
areas of numbness, (b) significant weakness in her left upper
and lower extremities, and (c) an inability to engage in ADLs,
including walking.[13]  In his report, Dr. Ching noted the
following: "... patient has questionable episodes of [loss of
consciousness] prior to admission.  Physical exam with
subjective sensory abnormalities on the L side, with
questionable weakness on the LUE and LLE.  No clear

---

[12] With respect to the last symptom, the intake nurse noted that she had to
open both of Plaintiff's eyelids to assess her eyes.  (R. 224).
[13] With respect to Plaintiff's gait, Dr. Ching noted that "patient is unable to
stand up, tends to fall."  (R. 311).

14

neuroanatomic explanation for her symptoms at this moment...."[14] (R. 309-13).

On September 3, 2007, while she remained hospitalized at Cleveland Clinic, Dr. Rani A. Sarkis performed a psychiatric evaluation of Plaintiff for "possible pain seeking behavior." Dr. Sarkis's impression was described as follows: "Chronic Pain Syndrome; Psychological Factors Affecting Physical Condition." Dr. Sarkis rated Plaintiff's score on the Global Assessment of Functioning ("GAF") scale between 51 and 60 which denotes moderate symptoms or moderate difficulty in social and occupational functioning.[15] Dr. Sarkis informed Plaintiff that she should schedule an intake appointment for a psychological pain management program. (R. 298-304).

While in Cleveland Clinic, Plaintiff also was evaluated for PT and occupational therapy ("OT"), resulting in a recommendation that Plaintiff be placed in a subacute nursing

---

[14] In reviewing Plaintiff's medical history, Dr. Ching noted that the hospital notes of her admission to Butler Memorial Hospital on August 23, 2007 "emphasize the fact that patient was constantly asking for valium, ativan and Dilaudid, stating that Morphine and Darvocet were not good for her." (R. 309). Valium is used, among other things, to relieve anxiety, muscle spasms and seizures. Ativan is used to relieve anxiety. Dilaudid is a strong analgesic used to relieve pain. The drug can be injected into a large muscle or added to an IV. Darvocet is a combination of drugs used to relieve mild to moderate pain. MedlinePlus.

[15] The GAF scale is a numeric scale used by clinicians to report an individual's overall level of functioning. The scale does not evaluate impairments caused by physical or environmental factors. The GAF scale considers psychological, social and occupational functioning on a hypothetical continuum of mental health – illness. The highest possible score is 100, and the lowest is 1. American Psychiatric Association: Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition, Text Revision (2000) ("DSM-IV").

facility because she was not safe with transfers. Due to
Plaintiff's high need for pain medication and lack of insurance,
however, there were no subacute nursing facilities willing to
accept her. Instead, Plaintiff was discharged from Cleveland
Clinic on September 10, 2007 with home PT for ambulation. (R.
305-07).

On September 13, 2007, Plaintiff presented to the ER of
GCMC complaining of syncope (loss of consciousness). Plaintiff
also reported constant, intense (10/10) pain in her head and
neck. (R. 716-17). A CT scan of Plaintiff's head showed no
change since her June 16, 2007 CT scan, i.e., there was no
evidence of acute hemorrhage or mass effect. (R. 722). A
nursing note indicates that Plaintiff was moaning loudly and
stating that she was unable to move her left upper and lower
extremities;[16] that Plaintiff's sister wanted her to be admitted
to the hospital because she believed Plaintiff was addicted to
narcotics and psychotic; that Plaintiff indicated a refusal to
stay in the hospital unless she received IV narcotics; that
Plaintiff removed all of her EKG leads and was yelling; that
Plaintiff crawled out of bed, dressed and walked out of the room
to use her cellphone showing full range of motion in all

---

[16] The report of the intake assessment noted that Plaintiff was "very dramatic
and theatrical." (R. 717).

extremities with no weaknesses or deficits; and that Plaintiff arranged for a taxi to take her home. (R. 723).

On September 17, 2007, Plaintiff presented to the ER of GCMC again. She was crying, clutching her back, and provided a rambling history of multiple episodes of syncope and seizures. Plaintiff reported that she was having a seizure and that she needed a Dilaudid IV to control her severe cervical pain. The diagnostic impression included possible syncope, malingering behavior, drug seeking behavior and constipation. (R. 702). Plaintiff underwent an obstruction series for her complaints of abdominal pain. A CT scan of Plaintiff's head was normal, showing no significant change since the CT scan four days earlier. (R. 712-13).

The next day, September 18, 2007, Plaintiff was admitted to Butler Memorial Hospital. A CT scan of Plaintiff's head upon admission showed no significant change since the CT scan performed on August 26, 2007 and no intracranial hemorrhage or mass effect. (R. 540). An echocardiogram and cardiac Doppler on September 19, 2007 for Plaintiff's complaints of syncope were normal. An EEG performed the same day while Plaintiff was awake was "probably within normal limits;" however, a follow-up EEG with prior sleep deprivation was recommended. (R. 548, 549-50, 552). An MRI of Plaintiff's brain was performed on September

20, 2007 due to her complaints of syncope, headaches and dizziness. The impression was described as follows:

IMPRESSION
1. Unchanged appearance of multifocal regions of high signal intensity within the white matter of the frontal lobes and parietal lobes. Findings could represent small vessel ischemic disease. There is slightly greater than expected cerebral atrophy for patient's age of 41 years.
2. No MRI findings suggestive of acute infarction.

(R. 538).

An MR angiogram of Plaintiff's brain the same day was normal. (R. 536).

Between mid-October 2007 and early November 2007, Plaintiff was visited by Medicare Aides to assist her with bathing and dressing on 5 occasions. A note completed by a Medicare Aide on November 6, 2007 indicates that Plaintiff reported being stronger. Therefore, she could bathe and transfer herself without assistance. (R. 452-53, 455-59, 460-61). During this period, Plaintiff also received skilled nursing services, PT and OT at home. (R. 406-22, 431-39, 441-50). In addition, Plaintiff was evaluated by a psychiatric nurse. (R. 424-29).

On November 9, 2007, Plaintiff was evaluated by Dr. Dennis Demby, her PCP, for complaints of recurrent pain in the head with muscle weakness. Plaintiff reported that she was unable to walk due to the muscle weakness, and, as a result, she was in a

wheelchair.[17] Plaintiff also reported smoking a ½ pack of

cigarettes on a daily basis. After examining Plaintiff, Dr.

Demby noted that Plaintiff's muscle weakness may be myopathy or

multiple sclerosis, and that Plaintiff's cervical

spondylolisthesis may be the reason for her headaches but a mass

lesion needed to be ruled out. Dr. Demby ordered tests for

Plaintiff, including an MRI of her brain, and indicated that she

would be referred to a neurologist. (R. 591-93).

The impression of the MRI of Plaintiff's brain on November

14, 2007 was described as follows:

> IMPRESSION Suspect demyelinating disease with prominent
> sulci and ventricles for the patient's young age and more
> than expected hyperintensities in the white matter
> bilaterally which have not changed. Alternative etiologies
> include vasculitis, Lyme disease, small vessel ischemic
> changes, migraine syndrome and Lupus.

(R. 534).

Plaintiff was taken by ambulance to GCMC on November 22,

2007. She was unresponsive due to an accidental overdose of

Fentanyl.[18] A CT scan of Plaintiff's brain was normal. She was

treated and transferred to Butler Memorial Hospital. (R. 695-

96, 701).

---

[17] With respect to Plaintiff's past medical history, Dr. Demby noted, among
other things, that Plaintiff had endometrial cancer and a radical
hysterectomy in 2007. (R. 591).
[18] Fentanyl, a narcotic, is used to relieve moderate to severe pain that is
expected to last for some time, that does not go away, and that cannot be
treated with other pain medications. MedlinePlus.

On November 29, 2007, Plaintiff was evaluated by Dr. Mark E. Hospodar, a neurologist, at Dr. Demby's request. Plaintiff described her problems as "attacks of vertigo associated with nausea, tremor, cold feelings, foggy vision, numbness throughout her whole body, poor dexterity, hot pokey feelings into her ears and drill-like feelings into her head and eyes," which began in January 2007. With respect to Plaintiff's physical examination, Dr. Hospodar noted, among other things, that he could not test Plaintiff's gait because she was in a wheelchair. In a follow-up letter to Dr. Demby, Dr. Hospodar indicated that he was going to send Plaintiff for blood work for myopathy and paraneoplastic disease, as well as a lumbar puncture (spinal tap) to rule out multiple sclerosis. (R. 613). The spinal tap was performed at St. Clair Hospital on December 3, 2007 and the specimens sent out for analysis. (R. 606).

Plaintiff was seen by Dr. Demby for continuing complaints of muscle weakness and headaches on December 11, 2007. Dr. Demby noted that they were still awaiting the results of the blood work and spinal tap ordered by Dr. Hospodar. Plaintiff was continued on Fentanyl and Fiorinal was added to her medication regime. (R. 590).

On December 17, 2007, Plaintiff was seen by Dr. Demby with complaints of head congestion, severe headaches, blurred vision, wheezing and shortness of breath. The doctor's diagnosis was

acute sinusitis, and he prescribed medication for Plaintiff.
(R. 763).

On January 2, 2008, Plaintiff was admitted to Butler
Memorial Hospital for severe abdominal pain. Testing revealed a
kidney stone. Plaintiff was treated, and, on January 9, 2008,
an abdominal CT scan showed that the kidney stone was no longer
present. (R. 907-17).

Plaintiff was seen by Dr. Demby on January 14, 2008 to
follow-up on her complaints of muscle weakness. Dr. Demby noted
that Plaintiff's examination showed neck pain upon flexion and
extension that radiated into her shoulders and up the back of
her head. Dr. Demby also noted that testing at Cleveland Clinic
revealed possible cervical instability following the C6-7
fusion, as well as spots on Plaintiff's brain that could not be
identified but "may have an element of multiple sclerosis." Dr.
Demby ordered an MRI of Plaintiff's brain to re-evaluate the
lesions for any change, and an MRI of Plaintiff's cervical spine
to determine whether the instability persisted. (R. 762).

The MRI of Plaintiff's brain was performed on January 17,
2008. The impression was described as follows:

IMPRESSION There are multiple areas of increased FLAIR
signal identified in the periventricular white matter which
are not significantly changed since the prior study. These
are more prominent than what would be expected given the
patient's age and are suspicious for demyelinating process
though are overall nonspecific. Alternatively this could

21

represent vasculitis, Lyme disease, small vessel ischemic changes, migraines, or lupus.

(R. 652).

An MRI of Plaintiff's cervical spine that day showed (a) postfusion at C6-7 without evidence of recurrent disc bulge or herniation; (b) central disc bulges at C3-4, C4-5 and C5-6, slightly more broad based at C5-6 with left neural foraminal narrowing; and (c) mild stenosis at C3-4 and moderate stenosis at C4-5 and C5-6 where there is probable mild cord flattening. (R. 650).

On January 24, 2008, a non-examining disability psychological consultant completed a Psychiatric Review Technique Form for Plaintiff, concluding that Plaintiff had the somatoform disorder of chronic pain syndrome. The consultant opined that Plaintiff was mildly limited in ADLs, social functioning and concentration, persistence or pace, and that Plaintiff had never had an episode of decompensation of an extended duration. (R. 614-26).

On February 7, 2008, a non-examining disability medical consultant completed a physical RFC assessment for Plaintiff, opining that Plaintiff could occasionally lift and carry 10 pounds; frequently lift and carry less than 10 pounds; stand and/or walk at least 2 hours in an 8-hour workday; sit about 6 hours in an 8-hour workday; had an unlimited ability to push and

pull other than shown for lifting and carrying; could
occasionally climb, balance, stoop, kneel, crouch and crawl; had
no manipulative, visual, or communicative limitations; and
should avoid hazards such as machinery and heights. (R. 628-
34).

On February 8, 2008, Plaintiff was seen by Dr. Demby for
evaluation of her cervical stenosis. Plaintiff reported
weakness in her arms and legs and several episodes of falling.
Plaintiff told Dr. Demby that she was attempting to get into
HealthSouth Harmarville Rehabilitation Hospital ("HealthSouth
HRH"), although she was "worried about how much her neck can
tolerate." Plaintiff was given Valium for spasms, Dilaudid for
breakthrough pain and Fentanyl patches. (R. 761).

Plaintiff was admitted to HealthSouth HRH on February 17,
2008 for ambulation problems. Following a rehabilitation
consultation, the physiatrist's assessment was (1) cervical
spondylosis status post discectomy with fusion, (2) chronic pain
syndrome for which Plaintiff was prescribed multiple pain
medications, (3) a history of migraine headaches for which
Plaintiff was prescribed Fioricet; and (4) neuropathy for which
Plaintiff was prescribed Neurontin. The plan for Plaintiff was
a comprehensive program that included PT and OT for
strengthening, ambulation, ADLs and self-care with the goal of

increasing Plaintiff's functional ability to a level of independence. (R. 954-57).

On February 19, 2008, during her admission to HealthSouth HRH, Plaintiff underwent a psychological consultation by Gary Breisinger, M.A., due to concerns over Plaintiff's adjustment to her disability. Among other things, Plaintiff informed Mr. Breisinger that she had a pending lawsuit against a hospital which diagnosed her with conversion disorder following a psychiatric consultation. Plaintiff denied depression or anxiety. Mr. Breisinger's diagnoses included (1) adjustment disorder with anxiety, (2) pain disorder, chronic, associated with both psychological factors and general medical condition, (3) question of psychological overlay needs to be ruled out, (4) rule out histrionic personality characteristics, (5) cervical spondylosis post discectomy with fusion at C6-7 in August 2006, (6) history of migraine headaches, (7) history of endometrial cancer status post hysterectomy and (8) radiculopathy. Mr. Breisinger rated Plaintiff's highest GAF score in the preceding year a 52, denoting moderate symptoms or moderate difficulty in social or occupational functioning. Mr. Breisinger indicated that he would attempt to engage Plaintiff in a working relationship to try to help her understand the aspects of her presentation that imply psychological overlay. (R. 948-49).

Plaintiff was discharged from HealthSouth HRH on March 1, 2008. In the psychological discharge summary completed by Mr. Breisinger, he noted that from the beginning of her treatment at HealthSouth HRH, Plaintiff's performance was inconsistent. Specifically, Plaintiff's functional capacity was different on different occasions and different when she did not know she was being observed. This inconsistency was the basis for Plaintiff's initial psychological consultation. In conclusion, however, Mr. Breisinger stated:

> ... Nevertheless, the patient's behavior in the second week of her treatment program speaks for itself. That is, on 02/25/08 (Monday), the patient challenged her fear regarding her pain and physical capacity and began a consistent improvement in her rehabilitation program. In fact, by the end of the second week near discharge, the patient was ambulating with the use of a cane and voiced her belief that she would soon be off the cane.
>
> I have assured the patient that although the psychological testing does suggest the possibility of psychological overlay and, in fact, is consistent with individuals who do have conversion disorder, her response to her treatment programs in terms of showing consistent effort and the improvement we would expect, belies the possibility of conversion disorder. That is, I have assured the patient that individuals with conversion disorder typically do not show the improvement pattern she has shown here. The patient deserves a great deal of credit for her effort in establishing consistency in improving her overall physical function during the second week of her treatment program. Again, the patient voiced her hope that she would be able to continue to improve her function, return to driving and possibly at some point, even begin to think about vocational planning and the possible eventual return to modified employment of some type.

(R. 946-47).

On March 5, 2008, Plaintiff underwent an OT evaluation for her diagnosis of cervical spondylosis. The report of the evaluation indicates that Plaintiff had recently been discharged from HealthSouth HRH and that she had been referred for continued outpatient OT and PT. At the time, Plaintiff's chief complaint was weakness and decreased coordination in her hands. Plaintiff reported that she was independent in ADLs and self-care. Plaintiff's rehabilitation potential was described as good. (R. 692).

On March 18, 2008, Plaintiff was seen by Dr. Demby for cervical spinal stenosis, an acute upper respiratory infection and breast pain. Dr. Demby noted that following physical therapy at HealthSouth HRH, Plaintiff was out of a wheelchair and using a cane to ambulate. With respect to her breast pain, Dr. Demby noted that Plaintiff was scheduled for a mammogram. Dr. Demby gave Plaintiff prescriptions for Valium and Fentanyl patches. (R. 760).

Plaintiff's mammogram, which was performed on April 3, 2008, showed a suspicious abnormality in the right breast. An ultrasound guided core biopsy confirmed a small irregular suspicious mass. (R. 894, 896-97). The pathology report indicated that the mass revealed infiltrating ductal carcinoma, and surgical excision of the mass was recommended. (R. 888). Plaintiff was referred by Dr. Demby to Dr. Cynthia Evans, an

oncologist, and surgery was scheduled for May 2, 2008. (R. 673-76).

On April 16, 2008, Plaintiff underwent nerve conduction studies and an EMG study of her upper and lower extremities for complaints of pain and parasthesis. Except for mild left carpel tunnel syndrome, the results were within normal limits. (R. 884).

Plaintiff saw Dr. Demby on April 24, 2008 for chronic headaches, chronic insomnia and assistance to stop smoking. (R. 759).

On May 2, 2008, Plaintiff underwent excision of the right breast mass and right axillary node dissection. (R. 870-74).

On May 14, 2008, Plaintiff returned to Dr. Demby for evaluation of her cervical spinal stenosis and recurring headaches. Plaintiff's physical examination revealed pain in her neck on rotary motion and flexion and extension; a positive straight leg raising test in the seated position; limited back flexion (30 degrees) due to pain; and limited back lateral motion (10 degrees) due to pain. Several medications were prescribed for Plaintiff, including a sleep aid and Vicodin for pain.[19] (R. 758).

---

[19] Vicodin, or hydrocodone, a narcotic, is available only in combination with other ingredients and different combinations are prescribed for different uses. Some hydrocodone products are used to relieve moderate to severe pain. MedlinePlus.

On May 14, 2008, Dr. Demby completed a Physical Capacity Evaluation for Plaintiff. Dr. Demby listed Plaintiff's diagnoses as cervical spinal stenosis with quadraparesis and right breast carcinoma, and indicated that her symptoms included upper and lower extremity weakness, recurrent headaches, chronic pain, fatigue and sleep disturbance. With respect to physical limitations, during an 8-hour work day, Dr. Demby indicated that Plaintiff could sit for 1 hour; stand for 1 hour; alternate between sitting and standing for 2 hours; needed to lie down for 4 hours; could not lift, grasp, push and pull, engage in fine manipulation or use her feet for repetitive movements; could never bend, climb, stoop, balance, crouch, kneel, crawl, reach, push and pull; and should avoid temperature extremes, moving machinery, vibrations and water. (R. 647-49).

Plaintiff underwent a whole body scan on May 27, 2008 which showed no evidence of metastatic bone disease. (R. 868).

On June 3, 2008, Plaintiff returned to Dr. Evans to discuss adjuvant treatment following her surgery for breast cancer. Dr. Evans recommended four cycles of chemotherapy, each cycle 21 days apart, to be followed by hormonal therapy and local breast irradiation.[20]  (R. 672).

---

[20] In anticipation of the chemotherapy, a venous port was placed in Plaintiff's left arm.  (R. 864-65).

On June 18, 2008, following her first cycle of
chemotherapy, Plaintiff received a chest x-ray during an
admission to Butler Memorial Hospital for mucositis and
neutropenia.[21]  The x-ray showed no evidence of infiltrate to
suggest pneumonia.  (R. 860).  On June 22, 2008, while still
hospitalized, x-rays of Plaintiff's right ankle and foot were
taken for pain.  The ankle x-ray was negative and the foot x-ray
showed no acute bony abnormality.  (R. 857-58).

Plaintiff was seen by Dr. Demby on June 27, 2008 for
complaints of right knee and ankle pain and swelling of one week
duration that was sustained in a fall and inadequate pain
control from Vicodin.  Plaintiff was noted to have limitations
in mobility requiring the use of a cane.  An ultrasound of
Plaintiff's right lower extremity showed no deep vein
thrombosis.[22]  Dr. Demby gave Plaintiff several medications,
ordered crutches for her, and referred her for an orthopedic
evaluation.  (R. 756-57).

Plaintiff returned to Dr. Evans for management of her
adjuvant cancer treatment on June 30, 2008.  Dr. Evans noted

---

[21] Radiation therapy and chemotherapy may cause mucositis or tissue swelling in
the mouth.  Symptoms include pain, sores and bleeding.  www.nlm.nih.gov/
encyc.  Neutropenia is an abnormally low count of neutrophils, white blood
cells that help your immune system fight off infections, particularly
bacterial and fungal infections.  www.mayoclinic.com.
[22] Deep vein thrombosis is a blood clot that forms in a vein deep in the body.
Most deep vein clots occur in the lower leg or thigh.  If the vein swells,
the condition is called thrombophlebitis.  A deep vein thrombosis can break
loose and cause a serious problem in the lung, called a pulmonary embolism,
or a heart attack or stroke.  MedlinePlus.

that Plaintiff developed neutropenia and fever after the first cycle of chemotherapy requiring hospitalization. In addition, Plaintiff became dehydrated and also had some oral mucositis. Plaintiff reported that she was feeling about the same; that she had injured her right knee in the hospital and could not bear weight on her right leg; that her appetite was fair; and that she was suffering from mild fatigue. Dr. Evans concluded that Plaintiff had recovered adequately from the first cycle of chemotherapy to proceed with the second cycle. Dr. Evans noted that there would be a slight dose reduction in the second cycle to decrease the toxicity. (R. 669-70).

On July 3, 2008, while hospitalized at Butler Memorial Hospital, an x-ray of Plaintiff's chest showed no acute abnormality or adverse change, and a CT scan of her chest for shortness of breath showed no evidence of pulmonary emboli or other acute process. (R. 853-55).

An x-ray of Plaintiff's chest was repeated during another admission to Butler Memorial Hospital on July 13, 2008. The x-ray showed no acute cardiopulmonary disease and no significant change since the x-ray ten days earlier. (R. 846). A repeat pulmonary angiogram that day for her history of chest pain and dizziness showed, among other things, a "suspected small amount of clot/pulmonary embolus in the interlobar artery, new since 7/3/08." (R. 844). On July 14, 2008, a venous Doppler of

30

Plaintiff's upper extremities was performed. The test showed what appeared to be an old clot. However, there was no evidence of venous thrombosis. (R. 841). A venous Doppler of Plaintiff's left lower extremities was performed the same day showing no evidence of deep venous thrombosis. (R. 839).

On July 16, 2008, while she continued to be hospitalized at Butler Memorial Hospital, Plaintiff underwent an MRI of her brain based on her complaints of headaches and visual disturbances for comparison with the MRI performed in January 2008. The exam was described as "near normal" with some scattered foci of bright FLAIR signal giving rise to a question of small vessel disease, vasculitis, migraine sequel or other end vessel abnormalities. (R. 837-39). On July 19, 2008, an x-ray of Plaintiff's right knee was taken due to complaints of pain. There was no fracture or subluxation and age appropriate degenerative changes. (R. 835). A chest x-ray on July 22, 2008 to check her Infuse-a-Port insertion showed no evidence of pneumothorax. (R. 833). Due to complaints of increasing joint pain, a whole body scan was performed on July 23, 2008 while Plaintiff remained hospitalized. The scan showed no evidence of metastatic bone disease. (R. 831).

On July 31, 2008, Plaintiff was admitted to Butler Memorial Hospital for continued complaints of chest pain. An x-ray of Plaintiff's chest was questionable for minimal infiltrate or

atelectasis in the left lung.[23]  (R. 825).  The next day, an

ultrasound to check for deep venous thrombosis in Plaintiff's

lower extremities was negative (R. 823); a CT scan of her brain

showed no acute intracranial findings (R. 822); a chest x-ray

for sudden shortness of breath and to rule out a pulmonary

embolism revealed minimal infiltrate in Plaintiff's left lung

(R. 820); and a CT scan of her chest revealed no evidence of

pulmonary emboli (R. 818).  An MRI of Plaintiff's brain the next

day showed subcortical chronic mild ischemic-type changes,

greater on the right, stable from 7/16/08, but nothing acute.

(R. 817).  On August 2, 2008, x-rays were taken of Plaintiff's

cervical, thoracic and lumbar spines.  The cervical spine x-ray

showed evidence of her previous anterior discectomy with plate

and screw fusion at C6-7 with narrowing of the disc space at C5-

6 and osteopenia;[24] the thoracic spine x-ray was unremarkable;

and the lumbar spine x-ray was negative.  (R. 812-13, 816).

On August 7, 2008, Plaintiff was seen by Dr. Demby to

follow-up on her hospitalization for shortness of breath and

chest discomfort.  Dr. Demby noted that Plaintiff had "an

existing diagnosis of pulmonary embolism;" that her symptoms

included shortness of breath, anxiety and syncope which occurred

---

[23] Atelectasis is the collapse of part or (much less commonly) all of a lung.
MedlinePlus.

[24] Osteopenia is a decrease in the amount of calcium and phosphorus in the
bones.  This can cause bones to be weak and brittle, and increases the risk
for broken bones.  MedlinePlus.

intermittently on a daily basis; that she suffered from pain radiating to her mid-back; that deep breathing and exertion exacerbated her symptoms; and that her treatment included inhaled bronchodilators. (R. 753-54). Four days later, Plaintiff underwent a CT scan of her chest for pain. The scan showed no evidence of pulmonary embolism or other acute process and no adenopathy. (R. 801).

On August 14, 2008, Plaintiff was seen by Dr. Evans for continued management of her breast cancer treatment. Plaintiff reported that she continued to feel poorly, suffered from severe fatigue and experienced problems with shortness of breath and chest pain. Dr. Evans noted that Plaintiff had had problems with toxicity from the chemotherapy resulting in repeated hospital admissions. As a result, it was decided that Plaintiff would not undergo any further chemotherapy at that time and she was referred for a cardiac evaluation. (R. 658-59). A chest x-ray that day revealed no active disease. (R. 798).

On August 22, 2008, Plaintiff called Dr. Evans' office to inform the doctor that she was entering a rehabilitation facility and would call upon her release to reschedule chemotherapy. A month later, Plaintiff canceled her appointment with Dr. Evans, indicating that she was no longer her doctor. (R. 655).

On September 22, 2008, an x-ray of Plaintiff's chest at Butler Memorial Hospital showed nothing acute, and an ultrasound of her right upper quadrant was normal (R. 788, 790).

On September 24, 2008, Plaintiff was seen by Dr. Demby to follow-up on her chronic pain. Dr. Demby noted that Plaintiff's pain currently was in her neck. Dr. Demby also noted that Plaintiff was being seen for an initial evaluation of chronic obstructive pulmonary disease ("COPD"); that Plaintiff's treatment for this condition included two inhalers; and that her symptom control had been fair. Plaintiff's physical examination showed no respiratory distress, normal respiratory rhythm and effort and clear bilateral breath sounds. (R. 749-50).

On September 27, 2008, Plaintiff presented to the ER of Butler Memorial Hospital complaining of chest pain and stroke symptoms. A CT scan of Plaintiff's chest showed no evidence of pulmonary embolism (R. 773); an x-ray of her chest showed no abnormality or adverse changes (R. 775); and a CT scan of her brain showed (1) no hemorrhage or other intracranial findings or adverse interval changes and (2) slight microvascular ischemic changes in the white matter and subinsular regions, similar to the prior exam (R. 777).

On October 1, 2008, Plaintiff presented to the ER of GCMC reporting a racing heart, a sharp pain in her mid-chest on inspiration that radiated to her back, difficulty breathing and

"jittery" feelings. Plaintiff reported that she could not walk
due to paraplegia resulting from a spinal cord injury and that
she could not move her left arm due to a recent stroke. Blood
tests were ordered and an x-ray of Plaintiff's chest was taken.[25]
Plaintiff was given Dilaudid for pain at 5:00 p.m. and 7:25 p.m.
Plaintiff was discharged at 8:10 p.m. following her first dose
of an antibiotic. At the time of discharge, Plaintiff denied
having pain, dressed herself, moved her left arm with strength
and walked 3 feet to the wheelchair. (R. 678, 682).

On October 19, 2008, Plaintiff was admitted to Butler
Memorial Hospital for left-sided numbness and a headache
persisting for 4 days. A CT scan of Plaintiff's brain was
normal, and a chest x-ray showed some mild new opacity in the
right mid-lung which could represent atelectatic changes though
pneumonia was not ruled out. (R. 768, 770). An MRI of
Plaintiff's brain the next day showed no evidence of acute
infarct, no abnormal enhancing lesion and no change in the small
scattered T2 hyperintensities in the subcortical white matter.
(R. 764).

On October 24, 2008, Plaintiff was seen by Dr. Demby for
bladder cramping and a pinching sensation in her neck. With
respect to Plaintiff's neck, Dr. Demby noted that Plaintiff had

---

[25] The chest x-ray showed no evidence of pulmonary embolus and no evidence of
metastatic disease. (R. 688).

experienced difficulty using her arms and persistent pain since the C6-7 fusion was performed in 2006, and that MRIs have shown changes demonstrating cervical spinal stenosis. Dr. Demby also noted Plaintiff's breast cancer diagnosis, lumpectomy and post-surgical chemotherapy. Dr. Demby's assessment included cervical spondylosis, breast neoplasm, COPD and cervical spine stenosis. A list of Plaintiff's then-current medications was set forth in Dr. Demby's office notes for this visit, which occurred 2 weeks before the ALJ hearing. The list included 3 inhalers and 21 different medications. Among the medications were Morphine, Oxycodone and Percocet, all narcotics. (R. 741-44).

On October 28, 2008, Plaintiff underwent an MRI of her lumbar spine for complaints of weakness. The impression of the lumbar spine MRI was described as follows:

IMPRESSION
1. Mild disc space narrowing and disc desiccation L5-S1. There is a small posterior central disc protrusion at L5-S1 resulting in mild impression upon the anterior aspect of the thecal sac and there is a small disc annulus tear posteriorly at L5-S1.
2. Moderate-to-severe bilateral L5-S1 neural foraminal narrowing.

(R. 938).

On November 10, 2008, a week after the hearing but before the ALJ issued a decision, Dr. Robert L. Eisler performed a psychiatric evaluation of Plaintiff at the ALJ's request. At the time, Plaintiff had been using a wheelchair for 2 weeks.

Plaintiff reported that she was "quite happy" and not depressed or anxious, and Dr. Eisler noted that Plaintiff did not show any symptoms of depression or anxiety. Dr. Eisler also noted: "She does have some pressure of speech and ideas. She knows all the medical terms related to her illness which she has studied and she describes all these in medical detail compulsively. She does have some grandiose ideas and plans, i.e., to take up holistic medicine along with general medicine and Japanese medicine." Dr. Eisler's diagnoses were Hypomania, Obsessive Compulsive Disorder with Histrionic Factors, and Pain Syndrome. Dr. Eisler described Plaintiff's prognosis as "quite guarded;" he rated Plaintiff's GAF score a 30;[26] and he opined that Plaintiff would most likely be unemployable for a year or more. (R. 941-42). With regard to making various occupational and personal-social adjustments, Dr. Eisler rated Plaintiff's abilities between fair and very good. As to making performance adjustments, Dr. Eisler rated Plaintiff's ability to understand, remember and carry out complex and detailed job instructions as poor to none and her ability to understand, remember and carry out simple job instructions as fair. (R. 933-34).

---

[26] A GAF score between 21 and 30 denotes the following: **Behavior is considerably influenced by delusions or hallucinations OR serious impairment in communication or judgment** (e.g., sometimes incoherent, acts grossly inappropriately, suicidal preoccupation) **OR inability to function in almost all areas** (e.g., stays in bed all day; no job, home, or friends)." DSM-IV.

## V. ALJ'S DECISION

In order to establish a disability under the Social
Security Act, a claimant must demonstrate an inability to engage
in any substantial gainful activity due to a medically
determinable physical or mental impairment which can be expected
to result in death or which has lasted or can be expected to
last for a continuous period of not less than 12 months.  42
U.S.C. § 423(d)(1).  A claimant is considered unable to engage
in any substantial gainful activity only if her physical or
mental impairment or impairments are of such severity that she
is not only unable to do her previous work but cannot,
considering her age, education, and work experience, engage in
any other kind of substantial gainful work which exists in the
national economy.  42 U.S.C. § 423(d)(2)(A).

When presented with a claim for disability benefits, an ALJ
must follow a sequential evaluation process.  20 C.F.R.
§§ 404.1520(a)(4) and 416.920(a)(4).  The process was described
by the Supreme Court in Sullivan v. Zebley, 493 U.S. 521 (1990),
as follows:

\*     \*     \*

Pursuant to his statutory authority to implement the
SSI Program, (footnote omitted) the Secretary has
promulgated regulations creating a five-step test to
determine whether an *adult* claimant is disabled.  Bowen v.
Yuckert, 482 U.S. 137, 140-42 (1987).  (footnote omitted).
The first two steps involve threshold determinations that
the claimant is not presently working and has an impairment

which is of the required duration and which significantly limits his ability to work. See 20 C.F.R. §§ 416.920(a) through (c)(1989). In the third step, the medical evidence of the claimant's impairment is compared to a list of impairments presumed severe enough to preclude any gainful work. See 20 C.F.R. pt. 404, subpt. P, App. 1 (pt. A)(1989). If the claimant's impairment matches or is "equal" to one of the listed impairments, he qualifies for benefits without further inquiry. § 416.920(d). If the claimant cannot qualify under the listings, the analysis proceeds to the fourth and fifth steps. At these steps, the inquiry is whether the claimant can do his own past work or any other work that exists in the national economy, in view of his age, education, and work experience. If the claimant cannot do his past work or other work, he qualifies for benefits.

\*   \*   \*

493 U.S. at 525-26.

The claimant bears the burden of establishing steps one through four of the sequential evaluation process for making disability determinations. At step five, the burden shifts to the Commissioner to consider the claimant's "vocational factors" (age, education and past work experience) and RFC and determine whether the claimant is capable of performing other jobs existing in significant numbers in the national economy. Ramirez v. Barnhart, 372 F.2d 546, 550-51 (3d Cir.2004).

With respect to the ALJ's application of the five-step sequential evaluation process in the present case, steps one and two were resolved in Plaintiff's favor: that is, the ALJ found Plaintiff had not engaged in substantial gainful activity since her alleged onset date of disability (April 15, 2006), and the medical evidence established that Plaintiff suffers from the

following severe impairments: status-post C6-C7 discectomy with cervical spondylosis, degenerative disc disease in the lower back, anxiety and pain disorder and COPD. (R. 13).

Turning to step three, the ALJ found that Plaintiff's impairments were not sufficiently severe to meet or equal the requirements of any impairment listed in 20 C.F.R., Pt. 404, Subpt. P, App. 1, and, in particular, the listings in Section 1.00 relating to the musculoskeletal system, and Listings 12.04 and 12.06, relating to affective disorders and anxiety-related disorders, respectively. (R. 13-14).

Before proceeding to step four, the ALJ assessed Plaintiff's RFC, concluding that Plaintiff retained the RFC to perform sedentary work with the following limitations:[27] (1) she cannot perform work involving ladders, ropes or scaffolds; (2) she can only occasionally feel with her left hand; (3) she must avoid exposure to extremes of cold and heat, as well as workplace hazards; (4) she cannot perform jobs involving occupational driving; (5) she can perform only simple, routine, repetitive tasks; and (6) she can only have limited interaction with supervisors, coworkers and the public. (R. 14-19). The

---

[27] For purposes of Social Security disability claims, sedentary work "involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met. 20 C.F.R. §§ 404.1567(a) and 416.967(a).

ALJ then proceeded to step four, finding that in light of Plaintiff's RFC, she is unable to perform any of her past relevant work. (R. 19).

Finally, at step five, considering Plaintiff's age, education, work experience, RFC and the VE's testimony, the ALJ found that Plaintiff could perform sedentary work existing in the national economy, including the jobs of a surveillance system monitor, an assembler and work in the optical industry.[28] (R. 19-20).

## VI. STANDARD OF REVIEW

The Court's review of the Commissioner's decision is limited to determining whether the decision is supported by substantial evidence, which has been described as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971). It consists of something more than a mere scintilla, but something less than a preponderance. Dobrowolsky v. Califano, 606 F.2d 403, 406 (3d Cir.1979). Even if the Court would have decided the case differently, it must accord deference to the Commissioner and affirm the findings and decision if supported by substantial evidence. Monsour Medical Center v. Heckler, 806 F.2d 1185, 1190-91 (3d Cir.1986).

---

[28] In fact, the VE testified that Plaintiff retained the RFC to perform the sedentary jobs of a surveillance system monitor, a sorter and an assembler in an industry such as the optical industry. (R. 49).

41

## VII. DISCUSSION

Plaintiff's initial argument in support of her motion for summary judgment relates to the weight accorded the medical opinion evidence by the ALJ. Plaintiff asserts that the ALJ erred by failing to give greater weight to the opinions of her PCPs, Dr. Mustovic and Dr. Demby, and the opinion of the consultative psychiatric examiner, Dr. Eisler, which support her claim of disability. (Docket No. 11, pp. 8-13). After consideration, the Court concludes that the opinion of Dr. Demby concerning Plaintiff's physical limitations, which established that she was disabled under the Social Security Act, should have been given controlling weight by the ALJ.[29] Thus, Plaintiff's motion for summary judgment will be granted.[30]

---

[29]With regard to Dr. Mustovic's conclusory opinion that Plaintiff was temporarily disabled from April 15, 2006 to April 15, 2008, the opinion was rendered in a form completed for the Pennsylvania Department of Public Welfare on August 8, 2007 and there is scant evidence in the record concerning Dr. Mustovic's treatment of Plaintiff. Thus, the Court disagrees with Plaintiff that Dr. Mustovic's opinion, which the ALJ failed to mention in his decision, was entitled to significant weight. As to Dr. Eisler's opinion that Plaintiff's score on the GAF scale was 30, denoting delusions or hallucinations or serious impairment in communication or judgment, the Court finds that the ALJ was entitled to reject this opinion. A GAF score of 30 is inconsistent with the other findings in Dr. Eisler's report regarding Plaintiff's mental condition. Moreover, there was substantial evidence in the record that was inconsistent with Dr. Eisler's opinion regarding Plaintiff's GAF score, i.e., significantly higher GAF scores by two other mental health professionals following evaluations of Plaintiff.

[30] In light of the Court's conclusion that Dr. Demby's opinion regarding Plaintiff's physical limitations should have been given controlling weight, the Court will not address Plaintiff's alternative arguments in support of summary judgment which pertain to (1) the ALJ's RFC assessment, (2) the hypothetical question presented to the VE on which the ALJ relied to deny disability benefits to Plaintiff, and (3) the ALJ's credibility determination.

A cardinal principle guiding disability eligibility determinations is that the ALJ accord treating physicians' reports great weight, especially "when their opinions reflect expert judgment based on a continuing observation of the patient's condition over a prolonged period of time."[31] Plummer v. Apfel, 186 F.3d 422, 429 (3d Cir.1999), *quoting* Rocco v. Heckler, 826 F.2d 1348, 1350 (3d Cir.1987). In addition, if a treating source's opinion on the issues of the nature and severity of a claimant's impairments is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in the case, it is entitled to controlling weight. 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2).

RFC is a claimant's maximum ability to perform sustained work on a regular and continuing basis, i.e., 8 hours a day, 5 days a week. With regard to the ALJ's finding that Plaintiff retained the RFC for a limited range of sedentary work, jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met. "Occasionally" means occurring from very little up to one-third of the time, and

_____

[31]The Social Security Regulations provide that, generally, an ALJ is to give more weight to the opinions of a claimant's treating sources "since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [a claimant's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations." 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2).

would generally total no more than about 2 hours of an 8-hour work day. Sitting would generally total about 6 hours of an 8-hour work day. An RFC for less than the full range of sedentary work reflects very serious limitations resulting from a claimant's medical impairments and is expected to be relatively rare. <u>See</u> Social Security Ruling ("SSR") 96-9p.[32]

The term "occupational base" means the approximate number of occupations that a claimant has the RFC to perform considering all exertional and non-exertional limitations and restrictions. A full range of sedentary work includes all or substantially all of approximately 200 administratively noticed unskilled sedentary occupations. An ability to stoop occasionally, i.e., from very little up to one-third of the time, is required in most unskilled sedentary occupations. A complete inability to stoop would significantly erode the unskilled sedentary occupational base and a finding that the claimant is disabled would usually apply. SSR 96-9p.

As noted in the Court's summary of the medical evidence before the ALJ, on May 14, 2008, Dr. Demby, Plaintiff's PCP for a significant period of time, completed a Physical Capacity Evaluation in which he opined that, during an 8-hour work day, Plaintiff was limited to sitting for 1 hour, standing for 1

---

[32] SSRs are agency rulings published "under the authority of the Commissioner of Social Security" and "are binding on all components of the Social Security Administration." <u>Sykes v. Apfel</u>, 228 F.3d 259, 271 (3d Cir.2000).

hour, and alternating between sitting and standing for 2 hours
due to her medical impairments.  For the remaining 4 hours of an
8-hour work day, Dr. Demby opined that Plaintiff would need to
lie down.  Dr. Demby also opined that Plaintiff could never
engage in certain postural activities including stooping.  Thus,
if Dr. Demby's opinion regarding the physical limitations
resulting from Plaintiff's medical conditions is entitled to
controlling weight, it necessarily follows that Plaintiff is
disabled within the meaning of the Social Security Act.[33]

Turning to the first requirement for Dr. Demby's opinion to
be entitled to controlling weight, i.e., the opinion must be
well-supported by medically acceptable clinical and laboratory
diagnostic techniques, the record contains abundant evidence
supporting Dr. Demby's Physical Capacity Evaluation of
Plaintiff.  Specifically, the record before the ALJ included (1)
numerous reports of abnormal MRIs and CT scans of Plaintiff's
cervical spine for complaints of neck pain and related symptoms;
(2) records of unsuccessful attempts to alleviate Plaintiff's
neck pain through PT from GCMC and Cleveland Clinic; (3) records
of Plaintiff's numerous ER visits and hospital admissions for
complaints of neck pain and related symptoms; (4) records of a

---

[33] Significantly, Dr. Demby's opinion on May 14, 2008 regarding Plaintiff's
physical limitations is bolstered by subsequent medical evidence in the
record, including Plaintiff's multiple hospitalizations for the toxic effects
of chemotherapy, her COPD diagnosis and notes of continued regular treatment
for her various other medical conditions.

pain specialist to whom Plaintiff was referred showing a
diagnosis of cervical radiculopathy and administration of three
series of cervical paravertebral and occipital nerve blocks; (5)
records of Plaintiff's receipt of skilled nursing services, PT
and OT at home; (6) records of a neurologist who evaluated
Plaintiff at Dr. Demby's request and referred Plaintiff for
tests; (7) records of Plaintiff's admission to HealthSouth HRH
for rehabilitation which indicate that although Plaintiff's
condition improved, she continued to ambulate with a cane at the
time of discharge; and (8) records showing an extraordinary
number of medications, including multiple narcotics, prescribed
for Plaintiff to control pain and other symptoms of her multiple
medical conditions. In sum, it is difficult to imagine a
medical opinion of disability that is more supported by the
record than the opinion of Dr. Demby in this case.[34]

---

[34] According to the Court's calculation, the medical evidence before the ALJ
for the period May 7, 2007 through October 28, 2008 included reports of 22 CT
scans, 19 MRIs, 27 sets of x-rays, 3 series of nerve blocks, a spinal tap, 6
ultrasounds, 2 abdominal pyelograms, a pulmonary cardiogram, 10 ER visits and
13 hospital or rehabilitative admissions. Assuming the ALJ sufficiently
reviewed the extensive medical evidence in this case, which is not clear from
the decision in which he noted that there are "nearly 900 pages of medical
evidence before me," his analysis of the evidence and its effect on
Plaintiff's ability to maintain employment on a regular and continuing basis
is woefully inadequate. For example, the ALJ totally fails to discuss the
effect of Plaintiff's numerous ER visits, hospitalizations, doctors' visits
and tests on her ability to meet an employer's attendance requirements. He
also fails to discuss the evidence regarding Plaintiff's need to use a cane
to ambulate and the impact that such a limitation would have on her ability
to work. Fargnoli v. Massanari, 247 F.3d 34, 41 (3d Cir.2001)(Although ALJ
is not expected in a Social Security disability case to make reference to
every relevant treatment note in a case where the claimant has voluminous
medical records, the ALJ, as the factfinder, is expected to consider and
evaluate the medical evidence in the record).

As to the second requirement for Dr. Demby's opinion to be entitled to controlling weight, i.e., that the opinion not be inconsistent with other substantial evidence in the record, an ALJ may not make speculative inferences from medical reports and may reject a treating physician's opinion outright only on the basis of contradictory medical evidence and not due to his or her own credibility judgments, speculation or lay opinion. Morales v. Apfel, 225 F.3d 310 (3d Cir.2000). Although not mentioned by the ALJ in his decision, the Court's thorough review of the medical evidence in this case reveals one medical opinion concerning Plaintiff's physical capacities that contradicts Dr. Demby's opinion - the Physical RFC Assessment completed by a non-examining State agency medical consultant on February 7, 2008. (R. 628-34). Nevertheless, the Court finds that the opinion rendered by the medical consultant on February 7, 2008 does not constitute substantial evidence.

First, the medical consultant's opinion was rendered without an examination of Plaintiff, and, therefore, it is not entitled to more weight than the opinion of a treating physician. Brownawell v. Comm. of Social Security, 554 F.3d 352, 357 (3d Cir.2008)(a longtime treating physician's opinion carries greater weight than that of a non-examining consultant).

Second, the medical consultant's opinion was rendered without consideration of a substantial amount of medical

evidence in the record pertaining to Plaintiff's treatment after the Physical RFC Assessment was completed but before the ALJ rendered his decision.[35] Cadillac v. Barnhart, 84 Fed.Appx. 163, 168-69 (3d Cir.2003)(in Social Security disability case, ALJ impermissibly substituted her own medical opinion for that of a physician when, in determining claimant's RFC, she gave controlling weight to the opinions of two non-examining state agency physicians while rejecting the conflicting opinion of another non-examining physician; the state agency physicians had not had access to claimant's complete medical record, whereas the other physician did have such access).

Third, although the medical consultant noted Plaintiff's evaluation by Dr. Nour, the pain specialist, on July 30, 2007 and cites the findings of Dr. Nour's physical examination of Plaintiff which favor his RFC assessment (R. 633), the medical consultant fails to acknowledge that Dr. Nour diagnosed Plaintiff with cervical radiculopathy and administered three sets of cervical paravertebral and occipital nerve blocks in an attempt to alleviate her neck pain and headaches.

---

[35] This evidence included, among other things, (1) the records of Plaintiff's two-week admission to HealthSouth HRH (indicating improvement but continued use of an assistive device to ambulate), (2) additional treatment notes of Dr. Demby, (3) Dr. Demby's Physical Capacity Evaluation, (4) the records pertaining to Plaintiff's breast cancer diagnosis, surgery and treatment resulting in several hospitalizations, and (5) records reflecting Plaintiff's COPD diagnosis.

Finally, in discounting Plaintiff's credibility, the medical consultant relied, in part, on the fact that Plaintiff "has not been prescribed narcotic medication for the pain." (R. 634). In fact, the records in Plaintiff's file at the time of the medical consultant's Physical RFC Assessment included the Health Sustaining Medication Assessment Form completed by Dr. Mustovic in August 2007 which indicated that Plaintiff was prescribed Morphine for her neck pain, as well as records of a hospitalization in November 2007 for an accidental overdose of Fentanyl, another narcotic.

Turning to the reasons stated in the decision for rejecting Dr. Demby's Physical Capacity Evaluation of Plaintiff, the Court finds the ALJ's reasoning to be impermissible. First, the ALJ states:

> "There are no findings in the progress notes of Dr. Demby that would indicate that the claimant had a herniated disc in her cervical spine, especially after her C6-C7 discectomy. There is thus no evidence that would justify a finding of a herniated disc in the cervical spine. Consequently, the May 14, 2008 medical source statement of Dr. Demby is not credible and not consistent with the overall record.... (R. 17).

Simply put, the Court is perplexed by the foregoing rationale offered by the ALJ to reject Dr. Demby's opinion regarding Plaintiff's physical limitations. As noted by Plaintiff, there is no evidence that Dr. Demby based his May 14, 2008 Physical Capacity Evaluation on a herniated disc diagnosis. (Document

No. 12, p. 14). Rather, Dr. Demby identified Plaintiff's
diagnoses as cervical spinal stenosis with quadraparesis and
breast cancer which are both supported by substantial evidence
in the record. (R. 647).

Second, the ALJ rejected Dr. Demby's Physical Capacity
Evaluation because "a tremendous number of diagnostic tests for
various complaints by the claimant throughout the year 2008 ...
were negative or marginal." (R. 17). Contrary to this
assertion, (1) an MRI of Plaintiff's brain on January 17, 2008
was abnormal for a person of Plaintiff's age suggesting
demyelinating process, vasculitis, Lyme disease, small vessel
ischemic changes, migraines or lupus (R. 652); (2) an MRI of
Plaintiff's cervical spine on January 17, 2008 showed central
disc bulges at C3-4, C4-5 and C5-6 with left neural foraminal
narrowing at C5-6, mild stenosis at C3-4, and moderate stenosis
at C4-5 and C5-6 with probable mild cord flattening (R. 650);
(3) a mass revealed in a mammogram on April 3, 2008 was
identified as infiltrating ductal carcinoma requiring surgery
and chemotherapy which resulted in multiple hospitalizations (R.
888); (4) an x-ray of Plaintiff's cervical spine on August 2,
2008 showed narrowing of the disc space at C5-6 and osteopenia
(R. 813); and (5) an MRI of Plaintiff's lumbar spine on October
28, 2008 showed, among other things, a central disc protrusion
at L5-S1 resulting in mild impression on the thecal sac, a small

disc annulus tear posteriorly at L5-S1, and moderate to severe
bilateral L5-S1 neural foraminal narrowing (R. 938).[36]

Third, in rejecting Dr. Demby's Physical Capacity
Evaluation, the ALJ asserted that as of October 2008,
Plaintiff's medications were Oxycodone, Morphine and Albuterol.
(R. 17). In fact, Dr. Demby's office notes for a visit on
October 24, 2008 indicate that Plaintiff was using 3 inhalers
and taking 21 different medications, including 3 narcotics, for
her various medical conditions. (R. 741-44). Moreover, 2 of
the 3 medications acknowledged by the ALJ are narcotics which
support, rather than undermine, Plaintiff's consistent
complaints of severe pain.

Fourth, the ALJ rejected Dr. Demby's Physical Capacity
Evaluation because the discharge summary from HealthSouth HRH in
March 2008 noted that Plaintiff was in stable condition.
However, the ALJ fails to acknowledge that the discharge summary

---

[36] The record also contains abnormal test results in 2007. Specifically, the
Court notes that (1) x-rays and a CT scan of Plaintiff's cervical spine on
May 31, 2007 showed neural foraminal narrowing at the C6-7 level (R. 221-22);
(2) an MRI of Plaintiff's cervical spine on June 11, 2007 showed mild to
moderate spinal stenosis at the C4-5 level and mild spinal stenosis at the
C5-6 and C6-7 levels (R. 255); (3) an MRI of Plaintiff's cervical spine on
June 17, 2007 showed moderate stenosis at C5-6 and C6-7 in part due to
congenital short canal and disc osteophyte complex (R. 348); (4) an x-ray of
Plaintiff's lumbar spine on June 17, 2007 showed mild degenerative disc
disease at the L5-S1 level (R. 350); (5) an MRI of Plaintiff's cervical spine
on August 20, 2007 showed stenosis at C5-6 and C6-7 and a minimal herniated
disc at L5-S1 (R. 215); (6) an MRI of Plaintiff's cervical spine on August
23, 2007 showed a mild diffuse annular bulge at C5-6 (R. 546); and (7) an MRI
of Plaintiff's lumbar spine on August 24, 2007 showed a small focal central
disc protrusion at L5-S1 (R. 544).

also indicates that Plaintiff continued to ambulate with the use of cane. (R. 946-47).

Fifth, in rejecting the Physical Capacity Evaluation of Dr. Demby, the ALJ stated it was significant that Plaintiff "was discharged from physical therapy on January 25, 2007."[37] However, the ALJ fails to acknowledge that the discharge summary directed to Dr. Mustovic also stated:

> Mrs. Nolan has been discharged from physical therapy, as she had failed to progress. As per two telephone conversations from your office, she had not made any objective or subjective gains in 7 visits. She was continuing to report 10/10 pain, continued headaches and continued numbness. She was not tolerating modalities or gentle stretching.... (R. 725).

Sixth, the ALJ rejected Dr. Demby's Physical Capacity Evaluation because the records of Cleveland Clinic show that Plaintiff was released on September 10, 2007 "without any restrictions and was scheduled to perform home physical therapy." However, the ALJ fails to acknowledge that the records of Cleveland Clinic also indicate that following a PT and OT evaluation during Plaintiff's admission, it was recommended that Plaintiff be placed in a subacute nursing facility because she was not safe with transfers. Plaintiff could not follow this recommendation due to her high need for pain medication and lack of insurance which resulted in the

---

[37] In fact, the PT discharge summary to which the ALJ was referring took place on June 25, 2007, not January 25, 2007. (R. 725)

52

unwillingness of any subacute nursing facility to accept her.
As a result, Plaintiff was discharged from Cleveland Clinic with
instructions for home PT.  (R. 305-07).

Finally, in rejecting Dr. Demby's Physical Capacity
Evaluation, the ALJ stated:

> Exhibit 24F contains the results of an October 20, 2008 MRI
> of the claimant's lumbar spine.  In relevant part, it was
> noted that the claimant had degenerative disc disease with
> a small annulus tear, as noted above.  An MRI of the
> claimant's lumbar spine in exhibit 9F, dated June 18, 2007,
> revealed only that the claimant had mild degenerative disc
> disease in the lumbar spine without any herniation.  The
> fact that the October 2008 MRI contained a suggestion of a
> possible small tear in the annulus is obviously indicative
> of such a small tear that it is not relevant for purposes
> of finding a truly herniated disc.  (R. 18).

First, the Court notes that the ALJ is not qualified to render
the foregoing medical opinion regarding MRI results.  Ferguson
v. Schweiker, 765 F.2d 31 (3d Cir.1985)("By independently
reviewing and interpreting the laboratory reports, the ALJ
impermissibly substituted his own judgment for that of a
physician; an ALJ is not free to set his own expertise against
that of a physician who presents competent evidence.").  Second,
as noted previously, Dr. Demby's Physical Capacity Evaluation
was not based on the diagnosis of a herniated disc in
Plaintiff's lumbar spine.

VIII. CONCLUSION

Based on the foregoing, the decision of the ALJ will be
reversed and the case remanded to the Commissioner for a

calculation of the disability benefits to which Plaintiff is

entitled based on the applications for DIB and SSI filed on

October 5, 2007.

William L. Standish
United States District Judge

Date: August 18, 2011